**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **ADONAI COMMUNICATIONS, LTD.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:10-CV-2642-L** |
| | § | |
| **AWSTIN INVESTMENTS, LLC, et. al.,** | § | |
| | § | |
| **Defendants.** | § | |

<u>**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**</u>

Pursuant to the order of reference dated June 3, 2011, before the court for recommendation is *Motion to Dismiss Original Complaint and First Amended Complaint by Defendants Premium Acquisitions, Inc., Premium Investments, Inc., Shorewood Associates, Inc., Shorewood Holdings Corp., and Michael Bernstein and Brief in Support Thereof*, filed April 6, 2011 (doc. 15). Based on the relevant filings, evidence, and applicable law, the motion to dismiss should be **DENIED**.

## I. BACKGROUND

This action arises out of an alleged breach of a contract involving Adonai Communications Ltd.'s (Plaintiff) sale of its shares in Awstin Worldwide Communications, Ltd. (Awstin WW) to Awstin Investments, LLC. Plaintiff sues an individual named Michael Bernstein; Awstin Investments, a Delaware limited liability company; and five Florida corporations - Shorewood Holdings Corp.; Shorewood Associates, Inc.; Premium Acquisitions, Inc., formerly known as MidCoast Acquisitions Corp.; MDC Credit Corp., formerly known as MidCoast Credit Corp.; and Premium Investors, Inc. formerly known as MidCoast Investments, Inc. (doc. 11 at 4-5.) It asserts claims for breach of contract, negligent misrepresentation, statutory fraud, common-law fraud, and fraud by non-disclosure, and it seeks indemnification and a judicial declaration of its rights and

duties under the share purchase agreement.  (*Id.* at 2.)

Plaintiff complains that a labyrinth of the Florida entities, led by Bernstein, promised to indemnify it and pay outstanding tax obligations as part of the share-purchase agreement at issue with absolutely no intention of fulfilling that promise.  (*Id.*)  It alleges that either MidCoast Investments or MidCoast Acquisitions formed Awstin Investments as a shell company for the sole purpose of acquiring its shares in Awstin WW, and that the MidCoast entities were all traceable to Bernstein.  (*Id.* at 4.)  It asserts that Bernstein is the sole shareholder of Shorewood Holdings, which is the sole shareholder of Shorewood Associates, which is the sole shareholder of MidCoast Credit, which in turn owns MidCoast Investments and MidCoast Acquisitions.  (*Id.* at 2-5.)  It also asserts that at the time of the transaction at issue, all of the entities shared the same address, and Bernstein was listed as the director, president, and secretary for all.  (*Id.* at 3.)

Plaintiff's uncontroverted allegations and evidence show that at the time of the transaction, it owned 82.5% of Awstin WW.  (*Id.* at 5; doc. 24, Ex. 1 at 2.)  In 2002, Awstin WW hired a broker to find a potential buyer for its stock and assets.  (doc. 11 at 6; doc. 24, Ex. 1 at 2.)  In 2004, the broker notified Awstin WW that MidCoast Investments was interested in buying its shares.  (*Id.*)  The broker entered into a finder's fee agreement with MidCoast Investments, and MidCoast Acquisitions paid the brokerage fee.  (doc. 11. at 6; doc. 24, Ex. 1 at 2, 9.)  MidCoast Credit entered into negotiations with Awstin WW regarding the share-purchase agreement.  (doc. 24, Ex. 1 at 2.)

Bill Podsednik, the secretary, treasurer, registered agent, and a shareholder of Awstin WW at the time, participated in the due diligence and negotiation of the share purchase agreement and worked with several lawyers representing MidCoast Credit.  (*Id.*)  One of those lawyers represented that MidCoast Credit would have to approve the share-purchase agreement and referred to

2

"MidCoast Credit's" purchase of Awstin WW shares. (*Id.*) Bernstein contacted Podsednik during the negotiations to discuss the indemnification provision of the share-purchase agreement and stated that the agreement would be revised if the provision was a deal-breaker. (*Id.* at 3-4.) During the negotiations and on its website, MidCoast Credit presented itself as a 47-year old company that was in the asset recovery business. (doc. 11 at 6; doc. 24, Ex. 1 at 2-3, 10-13.) The website for MidCoast Credit and MidCoast Acquisitions represented that MidCoast Credit had formed MidCoast Investments as its wholly owned subsidiary to acquire corporations to increase its cash flow and re-engineer them into the asset recovery business. (*Id.*)

In February 2004, Awstin WW received and accepted a letter of intent from MidCoast Investments to purchase its stock. (doc. 24, Ex. 1 at 3.) Along with legal counsel hired by Plaintiff, Podsednik reviewed the closing documents associated with the share purchase agreement. (*Id.* at 4.) One document was entitled "Written Consent in Lieu of Meeting of the Sole Member of Awstin Investments LLC." (*Id.* at 4, 14.) The document stated that Awstin Investments was the designee of MidCoast Investments, which in turn was authorized by its sole member, MidCoast Acquisitions, to enter into the share purchase agreement to purchase the outstanding shares of Awstin WW. (*Id.*)

The share-purchase agreement was signed in March 2004. (*Id.* at 4.) The agreement stated that it was between Awstin Investments, Awstin WW, Plaintiff, and other shareholders of Awstin WW. (doc. 1, Ex. 1 at 1.) The purchaser on the signature pages was listed as "Awstin Investments LLC, by MidCoast Acquisitions, Corp., its sole member." (*Id.* at 17.) Upon fulfillment of its terms, the agreement required funds received from the sellers to ultimately be wired to a beneficiary account in MidCoast Acquisition's name. (*Id.* at 10-12.) The agreement contained a choice of law provision requiring application of Texas law. (*Id.* at 14.)

Plaintiff alleges that after closing, the MidCoast entities did not retain the shares and use the infusion of cash as represented. (doc. 11. at 8.) Instead, less than three weeks after closing, they sold the shares to a Michigan limited liability company called Wilder Capital Holdings. (*Id.*; doc. 24, Ex. 1 at 5.) The signature page for the agreement between Awstin Investments and Wilder Holdings listed the "seller" as "Awstin Investments, LLC, by its sole member: MidCoast Acquisitions Corp." (doc. 24, Ex. 1 at 5, 31.) Bernstein signed the agreement as president of MidCoast Acquisitions, as president for MidCoast Credit, and as president for Awstin WW. (*Id.*) A promissory note was executed the same day between Awstin Investments, as borrower, and Awstin WW, as lender. (*Id.* at 5, 32-33.) Bernstein signed the note as president for "Awstin Investments, LLC, by MidCoast Acquisitions Corp., its sole member." (*Id.*) He also signed as president of MidCoast Credit, as the guarantor of the note. (*Id.* at 4, 32-33.)

In April 2010, Plaintiff received notice from the Internal Revenue Service ("IRS") that it was potentially liable for taxes that Awstin WW failed to pay. (doc. 24, Ex. 1 at 4.) On May 7, 2010, Plaintiff sent a demand letter to Awstin Investments, care of MidCoast Credit, to Michael Bernstein's attention, demanding payment of taxes and indemnification allegedly required by the share purchase agreement. (*Id.* at 4-5.) A law firm representing MidCoast Credit and MidCoast Acquisitions denied liability in a letter dated May 19, 2010. (*Id.* at 5, 16-17.)

On December 28, 2010, Plaintiff filed this lawsuit. On April 6, 2011, Bernstein, Premium Acquisition, Premium Investors, Shorewood Associates, and Shorewood Holdings ("Defendants") moved to dismiss the claims against them for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2). With a timely filed response, reply, and sur-reply, the motion is ripe.

## II.  ANALYSIS

Defendants move to dismiss the claims against them on grounds that there are no allegations and no evidence sufficient to support the exercise of personal jurisdiction over them.  They contend that they were not parties to the share purchase agreement at issue, and that the agreement was between Plaintiff, Awstin Investments, and Awstin WW.  They assert that Plaintiff's allegations and evidence are not sufficient to support an alter ego theory of personal jurisdiction.  An allegation of commonality of owners and officers alone, they argue, is not sufficient to satisfy that theory.

### A.  Personal Jurisdiction

Personal jurisdiction over a non-resident requires a determination of whether the non-resident is subject to jurisdiction under the laws of the state in which the court sits and the exercise of jurisdiction over the defendant comports with the due process requirements of the United States Constitution.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-74 (1985); *Panda Brandywine Corp. v. Potomac Electric Power Co.*, 253 F.3d 865, 867 (5th Cir. 2001).  A defendant is amenable to the personal jurisdiction of a federal court sitting in diversity to the same extent that it would be amenable to the jurisdiction of a state court in the same forum.  *Pedelahore v. Astropark, Inc.*, 745 F.2d 346, 347 (5th Cir. 1984); Fed. R. Civ. P. 4(e)(1), 4(h)(1).  Since the Texas long-arm statute authorizes the exercise of personal jurisdiction to the extent allowed by the Due Process Clause of the Fourteenth Amendment, only the federal due process inquiry needs to be addressed.  *Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999); *see* Tex. Civ. Prac. & Rem. Code Ann. § 17.041 *et seq.* (Vernon 1997).  "Exercising personal jurisdiction over a nonresident defendant is compatible with due process when (1) that defendant has purposefully availed himself of the benefits and protections of the forum state by establishing minimum contacts with the forum state, and (2) the

exercise of jurisdiction over that defendant does not offend traditional notions of fair play and substantial justice." *Panda Brandywine*, 253 F.3d at 867.

The "minimum contacts" aspect of the analysis can be established through contacts that give rise to general jurisdiction or those that give rise to specific jurisdiction. *Mink v. AAAA Dev. LLC*, 190 F.3d 333, 336 (5th Cir. 1999). General jurisdiction exists where the non-resident's contacts with the forum state are unrelated to the cause of action but are "continuous and systematic." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984); *Alpine View Co., Ltd. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000). Specific jurisdiction is appropriate where the non-resident has purposefully directed his activities at the forum state and the litigation results from the alleged injuries that arise out of or relate to those activities. *Id*. Under either a general or specific jurisdiction analysis, "the constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum [s]tate." *Burger King*, 471 U.S. at 474. To comport with due process, the defendant's conduct in connection with the forum state must be such that he "'should reasonably anticipate being haled into court' in the forum state." *Latshaw*, 167 F.3d at 211.

The party seeking to assert jurisdiction must present sufficient facts to make out only a *prima facie* case supporting jurisdiction over the nonresident. *Alpine View*, 205 F.3d at 215 (citing *Felch v. Transportes Lar–Mex SA de CV*, 92 F.3d 320, 326 (5th Cir. 1996). The court accepts that party's uncontroverted factual allegations as true and resolves all factual disputes in its favor. *Id*. The court, however, is not required "to credit conclusory allegations, even if uncontroverted." *See Panda Brandywine*, 253 F.3d at 869.

**B. Minimum Contacts**

Here, Plaintiff argues that the court has specific jurisdiction over MidCoast Acquisitions, MidCoast Investments, Bernstein, Shorewood Holdings, and Shorewood Associates, either because they have direct contacts sufficient to satisfy jurisdiction or because they are alter egos of entities that have minimum contacts with Texas or have submitted to the court's jurisdiction.  To make a *prima facie* showing of specific jurisdiction, a plaintiff must present sufficient facts to make a *prima facie* showing that (1) the defendant purposefully directed his activities at Texas and the litigation resulting from the alleged injuries arise out of or relate to those activities, and (2) the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice.  *See Panda Brandywine*, 253 F.3d at 867–68.

    1. <u>MidCoast Acquisitions n/k/a Premium Acquisitions</u>

Plaintiff argues that there is specific jurisdiction over MidCoast Acquisitions because, along with other defendants, it aimed tortious activity directly at a Texas company and knew that the brunt of the injury would be felt in Texas.  In the Fifth Circuit, "[w]hen an alleged tort-feasor's intentional actions are expressly aimed at the forum state, and the tort-feasor knows that the brunt of the injury will be felt by a particular resident in the forum, the tort-feasor must reasonably anticipate being haled into court there to answer for its tortious actions."  *Southmark Corp. v. Life Investors, Inc.*, 851 F.2d 763, 772 (5th Cir. 1988).  The Fifth Circuit has specifically stated that "when a nonresident defendant commits . . . an act outside the state that causes tortious injury within the state, that tortious conduct amounts to sufficient minimum contacts with the state" to constitutionally permit the exercise of personal jurisdiction over the tortfeasor.  *Guidry v. United States Tobacco Co., Inc.*, 188 F.3d 619, 628 (5th Cir. 1999).  "Even an act done outside the state that has consequences or

effects within the state will suffice as a basis for jurisdiction in a suit arising from those consequences if the effects are seriously harmful and were intended or highly likely to follow from the nonresident defendant's conduct." *Id.* Moreover, "[w]hen the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment. The defendant is purposefully availing himself of 'the privileges of causing a consequence' in Texas." *Wein Air Alaska Inc. v. Brandt*, 195 F.3d 208, 213 (5th Cir. 1999).

Plaintiff offers evidence showing that MidCoast Acquisitions was integral to the negotiation and consummation of the share purchase agreement at issue. It paid the broker who found Awstin WW on behalf of MidCoast Investments. It was the sole member of Awstin Investments and in that capacity designated MidCoast Investments to enter into the agreement to purchase Awstin WW's stock. The agreement listed the purchaser as Awstin Investments "by MidCoast Acquisitions, its sole member." Upon closing, the agreement required funds from the seller to be wired out to MidCoast Acquisitions' bank account in Florida. The agreement contained a choice of law provision that required application of Texas law. Less than three weeks after closing, when Awstin Investments sold Awstin WW to Wilder Holdings, the seller on the agreement was "Awstin Investments, by its sole member MidCoast Acquisitions Corp." It is evident from these facts that MidCoast Acquisitions participated in the negotiation, purchase, and sale of Awstin WW, a Texas entity, received funds in its bank account as a result of the share purchase agreement at issue, and anticipated application of Texas law to any dispute arising from the agreement at issue.

Additionally, Plaintiff makes allegations, uncontroverted by evidence, that the MidCoast entities made misrepresentations during the negotiations that they were legitimate businesses with asset recovery as their primary focus, and that they regularly acquired the shares of companies to

8

increase their cash flow in order to purchase bad debt.  It alleges that within three weeks of the agreement's closing, MidCoast Acquisitions along with the other entities sold Awstin WW to Wilder Holdings, as part of a tax avoidance scheme hatched with Wilder Holdings.  It further alleges that MidCoast Acquisitions, along with the other MidCoast entities, made misrepresentations that Awstin Investments would pay the deferred taxes and indemnify Plaintiff without any intention of doing so. Defendants' failure to controvert Plaintiff's specific factual allegations with an affidavit means that those allegations must be considered in favor of exercising personal jurisdiction over MidCoast Acquisitions.

Further, Plaintiff provides evidence that Bernstein, the president for the all three MidCoast entities, personally communicated to its representative that if the indemnification requested from Plaintiff was a deal-breaker, he would modify that particular provision in the agreement.  While Bernstein disputes that fact in an affidavit, all disputed facts must be resolved in favor of personal jurisdiction.  Finally, Plaintiff alleges that contrary to the representations made during the negotiations and to the provisions in the share purchase agreement, it has not been indemnified for millions of dollars in tax liability and is therefore the subject of IRS proceedings.  Because Plaintiff offers evidence and uncontroverted allegations showing that MidCoast Acquisitions participated in a fraud scheme aimed directly at a Texas entity and knew that the brunt of the injury would be felt in Texas, it has established a *prima facie* case of specific jurisdiction over MidCoast Acquisitions now known as Premium Acquisitions.

2.  <u>MidCoast Investments n/k/a Premium Investments</u>

To establish personal jurisdiction over MidCoast Investments, Plaintiff essentially argues that MidCoast Investments, participated in a fraudulent scheme aimed at a Texas company and knew

that the brunt of the injury would be felt by that company.   Plaintiff makes allegations, uncontroverted by evidence, that the broker introduced MidCoast Investments as a potential purchaser for Awstin WW and that MidCoast Investments entered into a finder's fee agreement with the broker.   Plaintiff offers evidence showing that MidCoast Investments was authorized by MidCoast Acquisitions to enter into the share purchase agreement and sent Awstin WW a letter of intent to purchase its stock in February 2004.   In fact, Awstin Investments, the party listed on the share purchase agreement as the purchaser, was MidCoast Investments' designee.

Plaintiff also offers evidence showing that it relied on misrepresentations from MidCoast Investments to enter into the agreement at issue, specifically regarding the nature of its business and its structure, including representations on its website that it was a debt purchaser in the asset recovery business and that any company it acquired was not dissolved, liquidated, or merged into another company.   Plaintiff further alleges that MidCoast Investments and the other MidCoast entities made representations that Awstin Investments would pay the deferred taxes and indemnify Plaintiff without any intention of doing so.   It specifically points to Bernstein's communication made to its representative regarding the indemnification provision.   It also offers evidence showing that contrary to the assertions on MidCoast Investments' website and assertions made by its representatives during the negotiations, Awstin WW's stock was flipped within three weeks of the agreement's closing.   Finally, it alleges that contrary to the those representations and the provisions in the share purchase agreement, it has not been indemnified for millions of dollars in tax liability and is therefore the subject of IRS proceedings.

In short, Plaintiff has presented allegations and evidence sufficient to show that MidCoast Investments initiated the transaction, signed the letter of intent, designated Awstin Investments to

10

enter into the share purchase agreement, made false representations through its president and on its website inducing Plaintiff to enter into the agreement, flipped the stock of Awstin WW contrary to those representations, failed to indemnify Plaintiff contrary to representations made by its president and in the share purchase agreement, and knew that a Texas company would be injured by this failure.  Since Plaintiff has presented allegations and evidence sufficient to show that MidCoast Investments was an integral part of a fraudulent scheme aimed at a Texas company and that the brunt of the resulting injury was felt in Texas, it has met its burden to establish a *prima facie* case of specific jurisdiction.   Notably, the causes of action alleged by Plaintiff arise out of the communications that MidCoast Investments made on its website and through its president, Bernstein.

3.  Michael Bernstein

Plaintiff alleges that the court has jurisdiction over Bernstein because he participated in the negotiation of the share purchase agreement and the sale of the stock acquired in Awstin WW.  Since Bernstein's alleged involvement in the transaction at issue was as president of the MidCoast entities, the fiduciary shield doctrine is implicated, which provides that an individual's transaction of business within the state solely as a corporate officer does not create personal jurisdiction over that individual even if there is personal jurisdiction over the corporation.  *See Stuart v. Spademan*, 772 F.2d 1185, 1197 (5th Cir. 1985).  The doctrine does not bar the exercise of personal jurisdiction over an individual, however, when the corporation is the alter-ego of the individual, or when the officers or agents of a corporation direct purposeful, tortious activity towards a particular forum.  *See id.* at 1198; *Lorenzana v. Gulf Coast Marine & Assocs. Inc.*, 2010 WL 4737424, at *3 (E.D. Tex. Nov. 16, 2010).  The theory is that since the corporation and its individual alter ego are the same entity,

the jurisdictional contacts of one are the jurisdictional contacts of the other for the purposes of the

due process analysis. *Patin v. Thoroughbred Power Boats, Inc.*, 294 F.3d 640, 653 (5th Cir. 2002).

"Under Texas law, '[a]lter ego applies when there is such unity between corporation and

individual that the separateness of the corporation has ceased and holding only the corporation liable

would result in injustice.'" *SEC v. Res. Dev. Intl, LLC*, 487 F.3d 295, 302 (5th Cir. 2007) (quoting

*Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex. 1986)). Alter ego "is shown from the total

dealings of the corporation and the individual, including the degree to which corporate formalities

have been followed and corporate and individual property have been kept separately, the amount

of financial interest, ownership and control the individual maintains over the corporation, and

whether the corporation has been used for personal purposes." *Castleberry*, 721 S.W.2d at 272.  In

the context of a personal jurisdiction inquiry, the alter-ego test is less stringent than that for ultimate

liability. *Stuart*, 772 F.2d at 1198 n. 12.

Plaintiff alleges that Bernstein essentially owns hundred percent of all of the non-resident

defendant entities.  It alleges that Bernstein is the sole owner of Shorewood Holdings, which wholly

owns Shorewood Associates, which wholly owns MidCoast Credit, which wholly owns MidCoast

Acquisitions, which in turn wholly owns Awstin Investments.  It further alleges that MidCoast

Investments is a subdivision of MidCoast Credit.  It asserts that at the time of the subject transaction,

Bernstein was listed as the director, president, and secretary of all of these entities and that he used

them to perpetrate fraud.  It also makes an uncontroverted allegation that the various entities used

the same address.

Based on the uncontroverted allegations and the evidence, the MidCoast entities all appeared

to be working as interchangeable entities on behalf of Bernstein, who appeared to be orchestrating

their moves by wearing different hats at different times.  For instance, MidCoast Investments hired

the broker who found Awstin WW, MidCoast Acquisitions paid the brokerage fee, MidCoast Credit

entered into negotiations regarding the purchase of Awstin WW's stock, MidCoast Investments sent

the letter of intent to purchase the stock, MidCoast Acquisitions signed the share purchase

agreement as sole member of Awstin WW, and the agreement required the funds from the seller to

be eventually transferred to MidCoast Acquisitions.  During negotiations regarding the share

purchase agreement, MidCoast Credit's representative referred to "MidCoast Credit's" purchase of

Awstin WW's stock, and when negotiations on the indemnification issue broke down, Bernstein

stepped in and assured Plaintiff that the issue would be resolved.  Bernstein signed almost all of the

related documents in his capacity as president of the various MidCoast entities.

Within three weeks of the share purchase agreement, Bernstein was heavily involved with

the sale of Awstin WW's stock to Wilder Capital.  On the signature page of the purchase agreement

with Wilder Capital, the seller was listed as Awstin Investments, through its sole member MidCoast

Acquisitions.  Bernstein signed the agreement as president of MidCoast Acquisitions, as president

for MidCoast Credit, and as president for Awstin WW.  On a promissory note executed the same day

between Awstin Investments as borrower and Awstin WW as lender, Bernstein signed as president

for MidCoast Acquisitions, the sole member of Awstin Investments, and as president of MidCoast

Credit as the guarantor of the note.  Notably, when Plaintiff's attorney sent a demand letter to

Awstin Investments, care of MidCoast Credit, a law firm representing both MidCoast Credit and

MidCoast Acquisitions responded on their behalf.

All of Plaintiff's factual allegations and evidence show that Bernstein was a perpetrator of

an allegedly fraudulent scheme to buy and flip the stock of Awstin WW while avoiding tax liability

allegedly assumed under the share purchase agreement at issue.  Since the alleged chain of ownership of all entities ultimately leads to sole ownership by Bernstein, and he alone is allegedly the registered agent, director, secretary, and treasurer of all of the entities, he had complete authority and control over all of the entities and their actions.  That Bernstein controlled the web of entities is further bolstered by the uncontroverted allegations that they share the same address.  In short, Plaintiff has carried its burden to make a *prima facie* case that the corporate structure of all the entities is merely a facade for Bernstein's interest and activities.  *See Stuart*, 772 F.2d at 1198 (holding that plaintiff's burden is to show that the corporate entity is merely a facade for the officers interests and activities).

Since all of the entities appear to be his alter-egos, their minimum contacts with Texas can be attributed to Bernstein to create specific jurisdiction over him.  Specifically, the contacts of MidCoast Credit and Awstin Investments, which have already conceded personal jurisdiction in this case, should be attributed to Bernstein.[1]  *See Patin*, 294 F.3d at 654 (citing with favor cases holding that it is consistent with due process to impute a corporation's waiver of personal jurisdiction to its successor or its alter ego).

### 4. Shorewood Entities

Plaintiff alleges that the court has personal jurisdiction over the Shorewood entities because MidCoast Credit is the alter ego of the Shorewood entities, which in turn are Bernstein's alter egos. As noted, the theory underlying the alter ego doctrine is that "because two corporations (or the corporation and its individual alter ego) are the *same entity*, the jurisdictional contacts of one *are*

---

[1]  While Bernstein states that he has not had hundred percent ownership of all defendant entities and that other shareholders have owned percentages of Premium Acquisitions, MidCoast Acquisitions, and Shorewood Holdings, this statement is not very specific and does not change the result in this case.

the jurisdiction contacts of the other for . . . purposes of the . . . due process analysis." *Patin*, 294 F.3d at 653 (emphasis in original).  "As a general rule . . . the proper exercise of personal jurisdiction over a nonresident corporation may not be based solely upon the contacts with the forum state of another corporate entity with which the defendant may be affiliated." *Freudensprung v. Offshore Technical Servs., Inc.*, 379 F.3d 327, 345 (5th Cir. 2004).  In determining whether a plaintiff asserting personal jurisdiction has overcome the presumption of corporate separateness, a court considers the following non-exhaustive factors: "(1) the amount of stock owned by the parent of the subsidiary; (2) whether the entities have separate headquarters, directors, and officers; (3) whether corporate formalities are observed; (4) whether the entities maintain separate accounting systems; and (5) whether the parent exercises complete control over the subsidiary's general policies or daily activities."  *Id.* (citing *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5th Cir. 1983))

For reasons discussed above, MidCoast Credit is the alter ego of the Shorewood entities, which in turn are the alter-egos of Bernstein.  Even though the Shorewood entities were not directly involved in these actions, they were the alter egos of Bernstein and served as key links in the chain leading to Bernstein's sole ownership of the entities directly involved in the transaction at issue. MidCoast Credit's minimum contacts are therefore attributable to the Shorewood entities to create personal jurisdiction over them.

## C.  Fair Play and Substantial Justice

Where, as here, the plaintiff meets its burden of proving minimum contacts, the defendant then has the burden of demonstrating that the exercise of jurisdiction would offend traditional notions of fair play and substantial justice.  *See Wien Air*, 195 F.3d at 215.  In order to meet that burden, the defendant must make "a compelling case that the presence of some other consideration

15

would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477. These considerations include the burden on the defendant, the interests of the forum state, the plaintiff's interest in obtaining relief, "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and "the shared interest of the several States in furthering fundamental substantive social policies." *Asahi Metal Indus. Co. v. Superior Court of California*, 480 U.S. 102, 113 (1987) (citing *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)). "Only in rare cases will the exercise of jurisdiction not comport with fair play and substantial justice where the nonresident defendant has purposefully established minimum contacts with the forum state." *Crawford v. Lee*, 2011 WL 2455658, at *3 (N.D. Tex. 2011) (citations omitted); *see also Wien Air*, 195 F.3d at 215.

Defendants do not present any compelling arguments to show that the exercise of jurisdiction offends traditional notions of fair play and substantial justice. Plaintiff argues that the exercise of personal jurisdiction over Defendants comports with fair play and substantial justice because MidCoast Credit and Awstin Investments have already answered in this case, the same counsel represents all of the defendants, and there is no overwhelming burden on Defendants that outweighs the legitimate interests of Plaintiff to have this case resolved in its home state of Texas. Without the non-resident defendants in this lawsuit, Plaintiff argues, it would be left seeking to impose liability on a phantom entity that has no assets, no headquarters, and no good standing with the state of Delaware. On balance, the court finds that the exercise of personal jurisdiction over Defendants does not offend traditional notions of fair play and substantial justice.

## III. RECOMMENDATION

Based on the foregoing reasons, Defendants' motion to dismiss should be **DENIED**.

16

**SO RECOMMENDED** on this 7th day of October, 2011.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE


**INSTRUCTIONS FOR SERVICE AND
NOTICE OF RIGHT TO APPEAL/OBJECT**

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE